**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

SANTIGO SANDERS, on behalf of Himself and others similarly Situated,

Plaintiff,

v.

ANTHONY ALAIMO, ANTHONY ALAIMO, INC; VALOR HOMES 521 LLC and VALOR PLUMBING LLC,

Defendants.

CIVIL ACTION FILE NO.

3:14-cv-163-TCB

**AFFIDAVIT OF ANTHONY ALAIMO**

**STATE OF GEORGIA**

**COUNTY OF FAYETTE**

ANTHONY ALAIMO appears and after being duly sworn, deposes and states:

1.

I, Anthony Alaimo, am an adult over the age of 18 and reside in Fayette County, Georgia. I am competent to testify to all matters set forth herein, which I

give of my own personal knowledge, or on information and belief.   I am giving this Affidavit in support of Defendants' Motion for Summary Judgment in this action.

2.

I am the owner and president of Anthony Alaimo, Inc. ("AAI"), one of the defendants in this case.   I am generally in the business of owning and operating residential housing units for rent to tenants.   There are several businesses that are involved in the management and maintenance of the various properties, but only AAI has employees.

3.

AAI employed the Plaintiff, Mr. Sanders, from August, 2010 until he stopped actively working in September, 2014.   Mr. Sanders is a plumber by training and experience and he was hired, as other plumbers are, to perform plumbing services on the various properties that are owned by one or another of the companies I have set up.

4.

As a plumber, Mr. Sanders' duties were performed "in the field."   That is, when a given property had plumbing needs, Mr. Sanders would be contacted by our office to inform him of the address of the property needing service and the work that needed to be performed.   Our company paid him on an hourly basis

based upon the number of hours he worked in a given pay period. To track and confirm an employee's work hours, employees use a feature on the phones we provide them where they clock in and clock out when they begin working or end working on a house. From the office, we used a GPS system that allowed our office to monitor where the employee was located at a given time and when he moved from one location to another. This allowed us to use technology to determine when he was actually working, giving the employee credit that when he was at a house where plumbing services were needed that he was working the entire time that he was there. Our company compares the clock-in and clock-out data to the GPS data to verify the clock-in data is correct. This method is highly accurate and was used uniformly to track Mr. Sanders' work, just like that of our other employees.

5.

On days when Mr. Sanders performed work at more than one house, his travel time from one house to another was considered work time, as it would be for most employees in that sort of role where work is performed at multiple locations. Our GPS system allowed us to accurately track the performance and work hours of Mr. Sanders and others who work in a similar manner.

6.

Over the course of his employment when payroll was being processed Mr.

Sanders was given the "time card" information compiled in our office as a result of

the GPS data.  This showed him what our records indicated as his total number of

work hours for all work days during a given pay period.  As part of our standard

practice, Mr. Sanders, like other employees, had the opportunity to review our

summary of his hours and, if he disagreed with the figures based on other

information he believed he had, he could submit that information and ask us to

make corrections.

7.

Throughout Mr. Sanders' employment by AAI he periodically asked us to

make time card corrections.  In AAI's office, we reviewed any time card

corrections sought by Mr. Sanders and made decisions as to whether to adjust the

hours we would pay based on whatever reasons he had submitted.  We often made

adjustments in Mr. Sanders' favor when his explanations appeared valid as to why

he had work time that was not captured by our GPS system.  In those instances, we

corrected (adjusted) the hours in our system and processed checks for Mr. Sanders

that included compensation for the full amount of hours determined as corrected.

Because our method was voluntary and conducted without any pressure placed on

employees, we never created any disincentive for employees such as Sanders to

report each and every instance where they felt hours worked, including overtime hours, had been underreported.

8.

Exhibit "B" to the accompanying motion is a true and correct copy of a summary generated from our company's payroll system database called "[Santigo] Time Card Correction Summary." This printout was generated at my direction from our computer's payroll database records and lists the time card corrections requested and made, or not made, as to Mr. Sanders' hours covering the period from October, 2012 until he ceased working. His last work days were in September, 2014 and the last time card corrections made, as shown on the Exhibit, were for a pay period in August, 2014.

9.

As the Time Card Correction summary shows, our company was generous in allowing employees to seek corrections to the number of hours we had recorded. This is reflected in the column with the heading "Agree?" As the Summary reflects, in the vast majority of instances our company agreed with the information provided by the employee and thus made the correction to total hours in the employees' favor. In many such instances, we "agreed" not because the information from Sanders was always correct but because we resolved doubts in his favor, as we did with other employees.

10.

Following the time card correction process, when it was time to issue payments to employees including Mr. Sanders, our company was fully aware of the law which requires payment of time-and-a-half for all hours in excess of 40 in a given work week, or "overtime" hours.   Prior to October of 2012, we had been in contact with the U.S. Department of Labor and understood how to properly compute and pay wages that included overtime pay, and had been doing so routinely for all employees, including Mr. Sanders.

11.

Our company's employment philosophy is one of incentivizing employees to do well by paying them well.  As part of that philosophy, we pay some of our employees discretionary bonuses, over and above the amounts shown as earned by all time records we approve.  Our practice with regard to discretionary bonuses is to first determine an amount we want to give to the employee and then to take that figure and gross it upward to 150%.  We do this so that when and if the discretionary bonus is reviewed it will be clear that if anyone regarded the bonus as being compensation for overtime hours we would have actually paid time-and-a-half on the bonus amount.

12.

When our company is ready to issue a payment to an employee for the discretionary bonus amount, we also review any time card corrections that have been made since the prior payroll period.  We then process checks to employees that include both the discretionary bonus amount being paid in that period and also the amounts determined by any time card corrections made in the same period.  A single check is issued to the employee containing those amounts.

13.

Whenever we pay an employee such as Mr. Sanders a discretionary bonus and for time card corrections, we issue a cover letter with the check.   The cover letter indicates that the amount being paid includes the discretionary bonus and time card corrections.  Our form letter has a place for the employee to sign to acknowledge and consent to the time card correction amounts.  An example of one such letter, signed and returned by Mr. Sanders, is attached hereto as Exhibit "C." Valor Homes 100, LLC is an entity that I use for purposes of office activity and correspondence, and is therefore the only one of our companies that has letterhead, but the example letter to Mr. Sanders was sent on behalf of AAI, his only employer.

14.

The practices I have described above were used routinely and consistently with Mr. Sanders throughout the period of his employment addressed in this case. Mr. Sanders at all times had the opportunity to review his time card summaries as compiled by the company, to seek corrections, to review and understand the corrections, and to let us know whether he consented to the corrections the company made. Whenever Mr. Sanders sought time card corrections they were resolved, without pressure, intimidation or retaliation and usually in the employees' favor. Throughout the period from 2012 to 2014, Mr. Sanders routinely signed off on the cover letters for the payment of his discretionary bonuses and time card corrections, indicating that he agreed to the corrections and the amount he was due. In this sense, as to each pay period in the two years before the lawsuit was filed, Mr. Sanders and AAI came to agreement as to the correct number of hours for which he was entitled to be paid and he acknowledge that the amount of payment was correct.

15.

Prior to filing this lawsuit, Mr. Sanders never objected to the company that he was not being paid overtime for all hours worked in excess of 40 for any given work week. Our payroll records made it clear that whenever Sanders worked

hours in excess of 40 for a week, he was paid the time-and-a–half rate for all overtime hours.

16.

Our company has a policy that applies to all plumbers and all of our other employees who are out in the field, and which policy applied to Mr. Sanders when he actively worked for us. All of those field employees are required to take lunch breaks and not work during their lunch hour unless they have a particular reason for needing to work during that hour; and, if so, they follow a procedure to request authorization to work during the one-hour break. This rule is imposed for safety, among other reasons. Mr. Sanders was advised of this rule and knew that it was being enforced. When authorization is requested to work during the lunch hour it is almost always granted, so Mr. Sanders would not have been subject to working a lot of extra hours without the company knowing it. Because we followed that rule, Mr. Sanders' work responsibilities did not result in requiring him to work during the lunch hour and did not result in a basis for his contending there are hours now in dispute where he worked and which our company failed to track or record. There were no time periods when Mr. Sanders was required to work, and did work, for which he was not paid the correct rate of pay, whether straight pay or overtime pay applied.

17.

In computing Mr. Sanders' pay, our company never took any deductions or setoffs that resulted in his being paid less than he had earned for a given pay period. Also, when the discretionary bonuses are taken into account, Mr. Sanders was regularly paid in amounts greater than what our company owed him based on actual time known to have been worked. Our practice in this regard was intentional: in addition to wanting to give our employees the incentive to do their best work and follow company rules, we wanted to make sure that we included in payment to our employees amounts that were sufficient to negate any computational errors we might have made.

18.

When Mr. Sanders filed this lawsuit last fall and we were served, I reviewed our company's history of payment to Mr. Sanders. I determined that there were no instances where we had failed to pay him at least the amount that he had earned for a given pay period. In a review and examination of our company's payroll and timekeeping records, I determined that there are no amounts that should have been paid to Mr. Sanders that were in excess of what he was actually paid. I also determined that due to our discretionary bonus practice and the manner in which we "grossed up" the amounts of bonus payments by 150%, Mr. Sanders has

actually been paid several thousand dollars more than AAI was obligated to pay him based on the number of actual hours worked.

19.

This lawsuit, in addition to naming Mr. Sanders' employer, AAI, as a defendant, also includes me, personally, and Valor Homes 521, LLC and Valor Plumbing, LLC as defendants.   The entities Valor Homes 521, LLC and Valor Plumbing, LLC do not have any employees and never have had any.  At no time from 2012 to 2014 was Mr. Sanders employed by any of our companies other than AAI.

20.

I, in my personal and individual capacity, have never had employees.  At no time was I ever personally Mr. Sanders' employer.

21.

Last fall our company received a letter from the U.S. Department of Labor, Wage & Hour Division, dated October 30, 2014.  A true and correct copy of that letter is attached to the accompanying Motion as Exhibit "D."  The letter, authored by Ms. Alesha S. Warren, Wage and Hour Investigator, indicated she intended to conduct a "Fair Labor Standards Act Compliance Review" ("Review").  The letter indicated Ms. Warren wished to see an extensive list of documents that were

contained in our company's business records. She further indicated that she intended to appear at our offices to perform the Review on November 6, 2014.

22.

Over the course of approximately the next two months, our office worked with Ms. Warren in complete cooperation with the Review. She did visit our office and we provided her all documents that she requested. We answered any questions she raised. In particular, the focus of the Review was as to our company's understanding of and compliance with overtime rules in the FLSA.

23.

In the course of the review, the documents we provided to Ms. Warren included all records related to Mr. Sanders that fell within the categories listed in her October 30, 2014 letter. There was nothing she requested that we did not provide or respond to. At the beginning of January, 2015 we were informed that Ms. Warren had completed` the Review.

24.

When the Review was concluded, our company was not charged with any violations of the FLSA. We were not told that he had any improper or incorrect payroll or employment practices. We were not told that we owed any money to any employees, including but not limited to, Mr. Sanders.

25.

Our company inquired as to whether the Wage & Hour Division was going to issue any sort of report at the end of the Review.  We learned, through our inquiry, that their practice was that they would not issue any report if no violations were found.  Thus, the fact that we were not cited for any violations is the manner in which the Review was closed.  The review of our payroll and business records gave the Wage & Hour Division all information they needed to determine whether they considered the claims asserted by Mr. Sanders to have any merit.  They did not inform us that we had failed to pay Mr. Sanders or any other employees overtime pay that was owed.  They also did not inform us that we had assessed any improper charges against Mr. Sanders or anyone else.

26.

Our company at all times treated Mr. Sanders fairly.  We believed we were in complete, good faith, compliance with all aspects of the FLSA and the Review by the Department of Labor reaffirmed that belief.  My position as the owner of the company that has been Mr. Sanders' employer has always been that we intended to pay him everything that he was entitled to and that if we were shown that we owed him any money we would pay it.

27.

In September, 2014, Mr. Sanders reported that he had suffered an injury that prevented him from being physically able to work. At the time he so reported, he stopped reporting for work and has not actively worked for us since. In an effort to make sure we took no adverse action against Mr. Sanders that could be improper, we have not terminated him from AAI's employment in a formal sense, although he no longer works.

28.

In the course of Mr. Sanders' employment, he was provided a company cell phone to use for business purposes and a set of keys that gave him access to the rental properties where he performed plumbing services. When it became clear that Mr. Sanders was not going to be returning to active work for AAI, we requested he return the keys and cell phone. We were and have been very patient on this issue because we did not want to in any way be deemed to have retaliated against Mr. Sanders for filing a claims against our company.

29.

There are no employees of AAI, the Valor entities or myself who could be "similarly situated" to Mr. Sanders in any way as asserted in the Complaint. The company that employed him, AAI, always paid him equal to or greater than the amounts we understood he was entitled to be paid based on actual time performed

and overtime laws. There is no basis in fact for Mr. Sanders to either assert claims against the Defendants in this case or to contend that there are other people he should be allowed to represent in a collective action.

30.

Shortly after he stopped actively working for our company, on October 6, 2014, Mr. Sanders called me on the phone, unexpectedly. He told me that he was going to pursue a lawsuit against me and my company claiming that he was owed overtime pay from us. I told him we were both aware of the procedures followed by AAI with regard to tracking hours, confirming with the employee and paying all that is owed, including overtime; that our company did not owe him any additional amounts for overtime; and that he knew it. He told me that he knew these things were true, and that he was not owed any additional money by the company, but that he intended to file a lawsuit because he wanted to run up legal bills for me. In that conversation he specifically admitted that our company had paid him all the overtime that we had owed him.

This 20 day of May, 2015.

ANTHONY ALAIMO

ANGELA SHOWS
MY COMMISSION EXPIRES
NOTARY
PUBLIC
April 7, 2018
FAYETTE COUNTY, GEORGIA

Sworn to and subscribed before me
this 20 day of May, 2015

______________________________
Notary Public
My Commission Expires:
4/7/18