## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SANTIGO SANDERS, on behalf of Himself and others similarly Situated,<br><br><br><br>Plaintiff,<br><br>v.<br><br>ANTHONY ALAIMO, ANTHONY ALAIMO, INC; VALOR HOMES 521 LLC and VALOR PLUMBING LLC,<br><br>Defendants. | CIVIL ACTION FILE NO.<br><br>3:14-cv-163-TCB |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Anthony Alaimo ("Alaimo"), Anthony Alaimo, Inc. ("AAI"), Valor Homes 521 LLC ("VH") and Valor Plumbing LLC ("VP") (collectively, "Defendants"), by and through their undersigned counsel, hereby set forth their Statement of Material Facts as to which There is No Genuine Issue to be Tried, in support of their Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

1.     Defendant Anthony Alaimo is the owner and president of Defendant Anthony Alaimo, Inc. ("AAI")   AAI owns and operates residential housing units for rent to tenants.  (Alaimo Aff. ¶2.)

2.     Of the several businesses that are involved in the management and maintenance of the various properties owned by Defendants only AAI has employees.   (Alaimo Aff. ¶2.)

3.     AAI employed the Plaintiff, Santigo Sanders, from August, 2010 until Sanders stopped actively working in September, 2014.  (Alaimo Aff. ¶ 3.)

4.     Mr. Sanders is a plumber by training and experience.  AAI hired him to perform plumbing services on the various properties that are owned or operated by one or another of the companies Mr. Alaimo has set up.  Mr. Sanders had been one of several plumbers employed by AAI in that capacity.  (Alaimo Aff. ¶3.)

5.     As a plumber, Mr. Sanders' duties were performed "in the field," i.e., at the location of the various properties owned by Defendants and related companies.  When a given property had plumbing needs, Mr. Sanders would be contacted by AAI's office to inform him of the address of the property needing service and the work that needed to be performed.  (Alaimo Aff. ¶ 4.)

6.     AAI paid Mr. Sanders on an hourly basis based upon the number of hours he worked in a given pay period.  AAI put in place detailed methods and

procedures to keep track of and confirm an employee's work hours.  This system included the use by employees of a feature set up on cellular phones provided by the company to the employees.  Using that feature, employees could "clock in" when they began work at a given house and "clock out" when that work assignment was completed.  (Alaimo Aff. ¶ 4.)

7.    From AAI's office, a GPS system was used to remotely monitor the locations where any particular employee was working at a given time and to provide a record of when that employee moved from one location to another. (Alaimo Aff. ¶ 4.)

8.    The use of this dual-tracking system of technology established when an employee was considered to be actually working.   As part of this practice, AAI gave the employee credit for working during the entire time when that employee was at a house that needed the plumbing services.    AAI compares the clock-in and clock-out data to the GPS data to verify the clock-in data is correct.  (Alaimo Aff. ¶ 4.)

9.    The dual method of tracking employee whereabouts and work time is highly accurate.  AAI uniformly and consistently used these methods to track Mr. Sanders' work, in the same manner that the work time and locations were tracked for other service employees of AAI.  (Alaimo Aff. ¶ 4.)

10.     AAI's tracking systems accounted for the work hours of employees who had assignments at more than one house in a given day.  When Mr. Sanders performed work at more than one house, his travel time from one house to another was considered work time; that was consistent with the practices regarding typical employees in that sort of role where work is performed at multiple locations "in the field."  AAI's GPS system allowed the company to accurately track the performance and work hours of Mr. Sanders and all others who similarly work as service personnel in the field.  (Alaimo Aff. ¶ 5.)

11.     Throughout Mr. Sanders' employment with AAI, by company practice he was provided the "time card" information compiled in AAI's office as a result of the clock-in/clock out and GPS data.  By this practice, Mr. Sanders was shown what his employer's records indicated as his total number of work hours for all work days during a given pay period.  (Alaimo Aff. ¶6.)

12.     As part of AAI's standard practice, Mr. Sanders, like other employees, had the opportunity to review the time card summary of his hours and, if he disagreed with the figures based on other information he believed he had, he could submit that information to AAI and ask his employer to make corrections. (Alaimo Aff. ¶6.)

13.     Throughout Mr. Sanders' employment by AAI he periodically asked his employer to make time card corrections.  In AAI's office, a review was made

of any time card corrections sought by Mr. Sanders and then AAI made decisions as to whether to adjust the hours it would pay based on whatever reasons Mr. Sanders had submitted.  (Alaimo Aff. ¶7.)

14.   AAI often made adjustments in Mr. Sanders' favor when his explanations appeared valid as to why he had work time that was not captured by the company's time-tracking systems.  In those instances, AAI corrected (adjusted) the hours in its system and processed checks for Mr. Sanders that included compensation for the full amount of hours determined as corrected. (Alaimo Aff. ¶7.)

15.   AAI's method of permitting employees to request time card adjustments was voluntary and conducted without any pressure placed on employees.  AAI therefore never created any disincentive for employees such as Sanders to report each and every instance where they felt hours worked, including overtime hours, had been underreported.  (Alaimo Aff. ¶7.)

16.   Exhibit "B" to the accompanying motion is a true and correct copy of a summary generated from AAI's payroll system database called "[Santigo] Time Card Correction Summary."   This printout was generated at the direction of Anthony Alaimo from AAI's computer's payroll database records and lists the time card corrections requested and made, or not made, as to Mr. Sanders' hours covering the period from October, 2012 until he ceased working.  His last work

days were in September, 2014 and the last time card corrections made, as shown on the Exhibit, were for a pay period in August, 2014.   (Defendants' Exhibit "B": Alaimo Aff. ¶8.)

17.    The Time Card Correction summary shows that AAI was generous in allowing employees to seek corrections to the number of hours the employer had recorded.   This is reflected in the column with the heading "Agree?"   The Summary shows that in the vast majority of instances AAI agreed with the information provided by Mr. Sanders and thus made the correction to total hours in the employees' favor. (Defendants' Exhibit "B.")   In many such instances, AAI "agreed" not because the information from Sanders was always correct but because the company followed the practice of resolving doubts in the employee's favor, a practice followed with regard to other employees as well.  (Alaimo Aff. ¶9.)

18.    Following the time card correction process, when it was time to issue payments to employees including Mr. Sanders, AAI did so with full awareness of the law which requires payment of time-and-a-half for all hours in excess of 40 in a given work week, or "overtime" hours.   (Alaimo Aff. ¶10.)

19.    Prior to October of 2012, AAI had been in contact with the U.S. Department of Labor and understood how to properly compute and pay wages that included overtime pay, and had been doing so routinely for all employees, including Mr. Sanders.  (Alaimo Aff. ¶10.)

20.   In order to incentivize employees to do their work well, AAI follows a philosophy of paying employees well.  As part of that philosophy, AAI pays some of its employees discretionary bonuses, over and above the amounts shown as earned as reflected in any or all of the time records that end up being approved (i.e., both original and corrected records).   AAI follows a practice with regard to discretionary bonuses that was specifically put in place to assure compliance with overtime pay requirements.  By this practice, AAI first determines an amount that it chooses to give to the employee as the discretionary bonus; that figure is then grossed upward to 150%.   That practice is followed so that AAI's records of the final discretionary bonus amounts will make it clear that all compensation over and above base wages for regular hourly work have been paid at a time-and-a-half rate. (Alaimo Aff. ¶11.)

21.   When AAI is ready to issue a payment to an employee for the discretionary bonus amount, they also review any time card corrections that have been made since the prior payroll period.  AAI then processes checks to employees that include both the discretionary bonus amount being paid in that period and also the amounts determined by any time card corrections made in the same period.  A single check is issued to the employee containing those amounts.  (Alaimo Aff. ¶ 12.)

22.    Whenever AAI pays an employee such as Mr. Sanders a discretionary bonus and for time card corrections, it issues a cover letter with the check.   The cover letter indicates that the amount being paid includes the discretionary bonus and time card corrections.  The form letter used by AAI for this has a place for the employee to sign to acknowledge and consent to the time card correction amounts. An example of one such letter, signed and returned by Mr. Sanders, is attached to Defendants' Motion as Exhibit "C."  (Alaimo Aff. ¶13.)

23.    Valor Homes 100, LLC is an entity that Mr. Alaimo uses for purposes of office activity and correspondence.   It is the only one of the various related companies that has letterhead.  The example letter presented as Exhibit "C" to Mr. Sanders was sent on behalf of AAI, his only employer.  (Alaimo Aff. ¶13.)

24.    The compensation practices set forth in the preceding paragraphs were used routinely and consistently with Mr. Sanders throughout the period of his employment addressed in this case.  (Alaimo Aff. ¶13.)

25.    Mr. Sanders at all times had the opportunity to review his time card summaries as compiled by his employee, AAI; to seek correction; to review and understand the corrections; and to inform his employer as to whether he consented to the corrections the company made.  (Alaimo Aff. ¶14.)

26.     Whenever Mr. Sanders sought time card corrections they were resolved, without pressure, intimidation or retaliation and usually in his favor. (Alaimo Aff. ¶14.)

27.     Throughout the period from 2012 to 2014, Mr. Sanders routinely signed off on the cover letters for the payment of his discretionary bonuses and time card corrections, indicating that he agreed to the corrections and the amount he was due.  In this sense, as to each pay period in the two years before the lawsuit was filed, Mr. Sanders and AAI came to agreement as to the correct number of hours for which he was entitled to be paid and he acknowledge that the amount of payment was correct.  (Alaimo Aff. ¶14.)

28.     Prior to filing this lawsuit, Mr. Sanders never objected to the company that he was not being paid overtime for all hours worked in excess of 40 for any given work week.  AAI's payroll records made it clear that whenever Sanders worked hours in excess of 40 for a week, he was paid the time-and-a–half rate for all overtime hours.  (Alaimo Aff. ¶15.)

29.     AAI has a company policy requiring all field employees, which included and applied to Sanders, to take lunch breaks during each work day.  The only exception to this is that when an employee makes a specific request to authorize working during what would otherwise be the lunch break, and gets

approval, he may work that time period and it will be counted as work hours.  This rule is imposed for safety purposes, among others.  (Alaimo Aff. ¶16.)

30.    Mr. Sanders was advised of AAI's lunch-break work rule and knew that it was being enforced.  (Alaimo Aff. ¶16.)

31.    When authorization is requested by a field employee to work during the lunch hour, that authorization is almost always granted.  The lunch break policy did not create a situation where Mr. Sanders would have been subject to working a lot of extra hours (during the lunch period on given work days in a pay period) without the company knowing it.  (Alaimo Aff. ¶16.)

32.    The lunch break rule was followed by AAI.  So, Mr. Sanders' work responsibilities did not require him to work during the lunch hour.    There is no basis, related to the lunch rule, for Sanders contending there are hours when he worked and which AAI failed to track or record.  (Alaimo Aff. ¶16.)

33.    There were no time periods when Mr. Sanders was required to work, and did work, for which he was not paid the correct rate of pay, whether straight pay or overtime pay applied.  (Alaimo Aff. ¶16.)

34.    In computing Mr. Sanders' pay, AAI never took any deductions or setoffs that resulted in his being paid less than he had earned for a given pay period.  (Alaimo Aff. ¶17.)

35.     When the discretionary bonuses are taken into account, Mr. Sanders was regularly paid in amounts greater than what AAI owed him based on actual time known to have been worked.  (Alaimo Aff. ¶17.)

36.     AAI's practice of paying employees, including Sanders, more than they were owed was intentional.  The two purposes for this practice were: (1) to give employees the incentive to do their best work and follow company rules; and (2) to assure that all legal obligations for the amount of compensation were met, so that any computational errors would be compensated for and not violate any applicable laws.   (Alaimo Aff. ¶17.)

37.     Following the institution of the instant action by Sanders, Mr. Alaimo personally reviewed AAI's history of payment to Mr. Sanders.  he determined that there were no instances where AAI had failed to pay Mr. Sanders an amount equal to or greater than what Mr. Sanders had earned for a given pay period.  In a review and examination of AAI's company's payroll and timekeeping records, Mr. Alaimo determined that there are no amounts that should have been paid to Mr. Sanders that were in excess of what he was actually paid.  (Alaimo Aff. ¶18.)

38.     Mr. Alaimo's review of Sanders' compensation history also confirmed that due to AAI's discretionary bonus practice and the manner in which the company "grossed up" the amounts of bonus payments by 150%, Mr. Sanders

has actually been paid several thousand dollars more than AAI was obligated to pay him based on the number of actual hours worked. (Alaimo Aff. ¶18.)

39.     During the entirety of his relevant employment, Mr. Sanders was only employed by AAI. Valor Homes 521, LLC and Valor Plumbing, LLC do not have, and never have had, any employees. No company other than AAI employed Sanders during the relevant period. (Alaimo Aff. ¶19.)

40.     Anthony Alaimo, personally and individually, does not have any employees. (Alaimo Aff. ¶ 20.)

41.     Beginning in October, 2014, the U.S. Department of Labor, Wage & Hour Division, initiated a "Fair Labor Standards Act Compliance Review" ("Review") by way of a letter dated October 30, 2014, from Ms. Alesha S. Warren, a Wage & Hour Investigator. A true and correct copy of that letter is attached to the accompanying Motion as Exhibit "D." In that letter, Ms. Warren stated she wished to see an extensive list of documents that were contained in AAI's business records. She further indicated that she intended to appear at AAI's offices to perform the Review on November 6, 2014. (Defendants' Exhibit "D"; Alaimo Aff. ¶21.)

42.     Over the course of approximately the next two months following the start of the Review, AAI's office worked with Ms. Warren in complete cooperation with the process. As part of the Review process, Ms. Warren visited AAI's office

and was provided all documents that she requested.  AAI answered any questions Investigator Warren raised. (Alaimo Aff. ¶ 22.)

43.    A particular focus of Ms. Warren's Review was as to AAI's understanding of and compliance with overtime rules in the FLSA.  (Alaimo Aff. ¶22.)

44.    During the course of the Wage & Hour Division Review, the investigator was provided with all records related to Mr. Sanders's employment by AAI that fell within the categories listed in her October 30, 2014 letter.   All documents requested were provided. (Alaimo Aff. ¶ 23.)

45.    At the beginning of January, 2015 AAI was informed that Ms. Warren had completed the Review.  AAI was not charged with any violations of the FLSA as a result of the Review.  Further, AAI was not informed that it was following any improper or incorrect payroll or employment practices.  (Alaimo Aff. ¶24.)

46.    At the conclusion of the Review, AAI was not required to pay any money to any employees, including but not limited to, Mr. Sanders, for any compensation shortfalls, as none were found in the Review.  (Alaimo Aff. ¶24.)

47.    The Wage & Hour Division followed a practice in this instance of issuing no report at the end of a Review in which no violations and no liability to employees are found against an employer.  There were no findings of failure by AAI to pay any overtime owed to Sanders or any other employees.  There were no

findings of any improper charges assessed against Sanders or any other employees. (Alaimo Aff. ¶25.)

48.    AAI at times treated Mr. Sanders fairly.  AAI has operated in good faith compliance with FLSA requirements.  The Review by the Department of Labor confirmed these facts.  (Alaimo Aff. ¶26.)

49.    As the owner and operator of AAI and its related companies, Anthony Alaimo has always intended, in good faith, to pay all employees at least the full amounts to which they are legally entitled and, as such, if any investigation showed that an employee was owed an amount not yet paid, his company would pay it. (Alaimo Aff. ¶ 26.)

50.    In September, 2014, Mr. Sanders reported to AAI that he had suffered an injury that prevented him from being physically able to work.  At the time he so reported, he stopped reporting for work and has not actively worked for AAI since. Mr. Sanders has not been formally terminated by AAI, but he no longer works for the company.  (Alaimo Aff. ¶ 27.)

51.    In the course of Mr. Sanders' employment, he was provided a company cell phone to use for business purposes and a set of keys that gave him access to the rental properties where he performed plumbing services.  When it became clear that Mr. Sanders was not going to be returning to active work for AAI, the company requested he return the keys and cell phone.  AAI has at all

times been patient on this issue because it did not want to in any way be deemed to have retaliated against Mr. Sanders for filing the instant claims.  (Alaimo Aff. ¶28.)

52.     There are no employees of AAI, the Valor entities or Anthony Alaimo personally who could be "similarly situated" to Mr. Sanders in any way as asserted in the Complaint.  The company that employed him, AAI, always paid him equal to or greater than the amounts it understood he was entitled to be paid based on actual time performed and overtime laws.  There is no basis in fact for Mr. Sanders to either assert claims against the Defendants in this case or to contend that there are other people he should be allowed to represent in a collective action.  (Alaimo Aff. ¶29.)

53.     Shortly after Sanders stopped actively working for AAI, on October 6, 2014, he called Anthony Alaimo on the phone, unexpectedly.  In that call, Sanders told Alaimo that he was going to pursue a lawsuit against Alaimo and his company claiming that he was owed overtime pay from them.  Alaimo told Sanders that both of them were aware of the procedures followed by AAI with regard to tracking hours, confirming with the employee and paying all that is owed, including overtime; that AAI did not owe him any additional amounts for overtime; and that he [Sanders] knew this to be true.  (Alaimo Aff. ¶30.)

54.     In that phone conversation, Sanders admitted that he knew he was not owed any additional money by his employer, but that he intended to file a lawsuit

because he wanted to run up legal bills for Alaimo.  In that conversation Sanders admitted the company had paid him all the overtime that it had owed him. (Alaimo Aff. ¶ 30.)

    Respectfully submitted, this 29 day of May, 2015.


                         **RICHELO LAW GROUP, LLC**

               By:   /s/ Thomas Richelo
                    Thomas Richelo, Esq.
                    Ga. State Bar No. 604425
                    Attorneys for Defendants

8230 Grogans Ferry Road
Atlanta, Georgia 303
Tel: (404) 983-1617
trichelo@richelolaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2015, I electronically filed the following pleading with the Clerk of Court using the CM/ECF system:

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

And further, as to the *pro se* plaintiff, who has not registered to receive service from the Court using the CM/ECF system, I certify that the foregoing is being served by certified mail, return receipt requested, with adequate postage affixed thereto to assure delivery to the following:

Santigo Sanders
2085 Freeman Road
Jonesboro, GA 30236

/s/ Thomas Richelo
Thomas Richelo
Ga. Bar No. 604425
trichelo@richelolaw.com

- 17 -